GEORGE E. CARDEN and ANDERSON T. HERD, Appellants, v. SARA E. THOMPSON and MARCELLA THOMPSON BERKLEY, Administratrices of the Estate of JOHN W. THOMPSON.—62 S. W. (2d) 882.

Division Two, July 14, 1933.

*Fordyce, Holliday & White* and *Walter R. Mayne* for appellants.

220

*Randolph Laughlin* for respondents.

FITZSIMMONS, C.—This case comes to the writer upon reassignment. It is founded upon a demand in the sum of $158,366.67 and interest filed by plaintiffs (appellants) in the Probate Court of the City of St. Louis against the estate of John W. Thompson, deceased. The demand is based upon an alleged conversion by the deceased of appellants' undivided half interest in the tank steamer Gut Heil. The respondent administratrices answered denying the claim. They also filed four counterclaims. Under a stipulation of the parties looking to a speedy, first trial in the circuit court, the probate court rendered judgment denying the demand of appellants and the counterclaims of respondents. Both parties then appealed to the Circuit Court of the City of St. Louis, where by the stipulation previously filed the cause was tried before the court without a jury. Judgment resulted in favor of respondents on appellants' demand, and in favor of respondents on their first counterclaim in the sum of $341,663.55, and in favor of appellants upon respondents' three other counterclaims. Thompson died May 3, 1926, and respondents are his administratrices of his estate. The plaintiffs alone appealed to this court. The following pertinent facts are gleaned from the opinion of the trial court which made a separate finding of facts and conclusions of law.

"On April 27, 1913, the iron tanker Gut Heil collided with two other vessels and sank in the Mississippi River near Baton Rouge, Louisiana. Several unsuccessful efforts were made to recover her. On February 3, 1914, the owner definitely decided to abandon the vessel, and caused the Engineers' office of the United States Army to be so notified. The tanker remained a submerged and abandoned derelict for more than two years and nine months thereafter. In November, 1916, John W. Thompson took possession of the vessel as an abandoned wreck. By means of contracts between him and the Atlantic Towing Company and the Atlantic Towing Company and Kind and Wotherspoon, and by the joint efforts of Thompson's men and Kind and Wotherspoon's men, the vessel was successfully floated on December 5, 1917.

"On October 12, 1917, the United States Shipping Board promulgated its General Requisition Order, whereby it requisitioned all American cargo ships of 2,500 tons or more. Thomas B. Love, as attorney for Thompson, endeavored to get relief from this General Requisition Order, but without success. By contract with Thompson, the Atlantic Towing Company acquired a half-interest in Thompson's title to the vessel. Prior to April 1, 1918, Thompson and the Atlantic Towing Company had been engaged as co-owners and partners in

undertaking to salvage said vessel. About March 27-30, 1918, the Atlantic Towing Company made Thompson a give-or-take offer on half-interest in the vessel. Thompson elected to take, to pay the Atlantic Towing Company $428,000 for its half-interest, and to release it of moneys which it was owing him for cash advanced and disbursed on its account, and for the use of his tugs, barges, scows, dredges and pontoons which had been used in the salvaging operation.

"Some time between March 30 and April 6, 1918, the said Thompson and the claimants Carden and Herd entered into an oral agreement, whereby Thompson agreed to purchase the half-interest of the Atlantic Towing Company in said vessel for the claimants, and whereby the claimants agreed to pay for the half-interest so purchased a sum equal to the moneys expended by Thompson in the salvaging, repairing and acquisition of said ship. On or about April 8, 1918, the claimants herein, George A. Carden and Anderson T. Herd, by and through said John W. Thompson acting as their agent, duly purchased a one-half interest in said steamer from said Atlantic Towing Company, the said Thompson paying for such interest to the Atlantic Towing Company the following:

"(a) Four hundred and twenty-eight thousand dollars in cash.

"(b) The release of about $109,097.53 which the Atlantic Towing Company was owing Thompson for moneys advanced by him on its account in the operation of raising the vessel.

"(c) The release of about $250,000, which it was owing him for the use of his tugs, barges, scows, dredges and pontoons.

"Upon so purchasing said interest said John W. Thompson and the claimants herein became the co-owners and partners in the said steamer Gut Heil, and the said claimants promised and agreed to pay said Thompson for the half-interest so purchased for them. Just what they agreed to pay him is the principal fact here in controversy. The claimants contend that their agreement in this behalf is evidenced by Exhibit FF. The defendants contend that said agreement was as the same is set forth in Spencer Exhibit 7. I find this issue in favor of the defendants, and I shall now set forth my reason for so finding."

The reasons of the trial court for finding that the contract of the parties was evidenced by Spencer Exhibit 7 and not by Exhibit FF are not necessary to be set out at large in this statement of facts. Suffice it to say that there was substantial evidence to sustain the finding. Exhibit FF is as follows:

"Hotel Traymore,
"Atlantic City, N. J. 4/1/18
"J. W. T.

"Mr. Thompson has in boat ...................... $ 26,000.00
"Underwood & Associates ...................... 178,000.00
"Total ...................... $204,000.00

"Mr. Underwood and associates are to receive $250,000.00 and the return of the $178,000.00, of which Mr. Thompson is to pay $76.-000.00, and parties purchasing. Mr. Underwood and Associates interest are to pay $102,000.00. Then Mr. Thompson and parties purchasing interest of Underwood and Associates will own the boat equally; that is to say, Mr. Thompson will own one-half and parties purchasing Underwood and Associates will own the other half. The above figures of $204,000.00 are only approximated and may be changed by detailed account. and there will be some court costs.

"Underwood and Associates are to only receive the money they can show they have actually spent, and in addition $250,000.00 profit. Mr. Herd and associates are to pay $250,000.00, and $102,000.00 above provided.

"J. W. T."

"Mr. Underwood and Associates" to whom reference is made in Exhibit FF are the Atlantic Towing Company mentioned in the trial court's statement of facts. "Parties purchasing interests of Underwood and Associates" mentioned in Exhibit FF are appellants George H. Carden and Anderson T. Herd, who produced the exhibit. Respondents called five witnesses. of whom four were experts, all of whom testified that the initials, J. W. T. appearing at the top and at the bottom of Exhibit FF were not in the handwriting of John W. Thompson, deceased. Appellants produced one witness who gave it as his opinion that the initials were in the handwriting of Thompson. The trial court in finding that the contract of the parties was not made by Exhibit FF specifically found that the initials upon this exhibit were not written by John W. Thompson.

The Spencer Exhibit No. 7, which the trial court found expressed the agreement of the parties, was attached to the deposition of Mr. W. B. Spencer, a New Orleans lawyer, who represented Mr. Thompson in 1928. This exhibit purported to be an agreement dated April 25, 1918, between John W. Thompson of the city of St. Louis, Missouri, called the seller, and Anderson T. Herd and George A. Carden, both of the city of New York, called the purchasers (appellants here). After reciting that Thompson was the owner as finder of the steamship Gut Heil and, by the expenditure of large sums of money, had acquired the ownership thereof and that the purchasers were desirous of obtaining a one-half interest in the ship. the exhibit recited a sale by Thompson to appellants of a half interest in the ship. The consideration was thus expressed:

"2nd. The price and consideration of the foregoing sale and transfer is hereby fixed as a sum equal to the moneys expended by said Seller in the salving, repairing, and acquisition of said ship, including court costs and attorney's fees, up to the 25th day of April, 1918, and on account of said purchase price the Purchasers have, on the execution of this agreement, paid in cash to the Seller the sum

of three hundred and fifty thousand ($350,000) dollars, and are to pay the balance of said purchase price on presentation and settlements of accounts showing the actual expenditures made by the Seller, as aforesaid.''

The contract further provided that in case of transfer of title of the ship to a corporation, Thompson and appellants each should receive one-half of the capital stock of the corporation and each should nominate one-half of the directors; that costs and expenses incurred subsequent to April 25, 1918, for the repair and outfitting of the ship should be borne one-half by the Seller Thompson and one-half by the purchasers and that until the steamship should be transferred to a corporation Herd and Thompson should jointly manage it. Although the exhibit bears date of April 25, 1918, Mr. Spencer's testimony was to the effect that he did not draft it until July 25, 1918.

It is conceded that appellants did not pay to Thompson the sum of $350,000 mentioned as part of the purchase price in Spencer's Exhibit No. 7. But appellants did pay to Thompson various sums of money aggregating $52,000 as their part of the cost and expense of salvaging, repairing and reconditioning the ship. Respondents' testimony tends strongly to show that subsequent to April 25, 1918, and particularly in July, 1918, Thompson pressed appellants for payment of the $350,000 mentioned in the Spencer Exhibit 7. When appellants did not pay this sum, Thompson directed his attorney Spencer to notify appellants that, they having failed to perform their contract, Thompson elected to terminate it. This Spencer did by letter dated August 1, 1918, with which letter Spencer on behalf of Thompson remitted to appellants the sum of $52,541.66 which had been ascertained to be the amount which appellants had contributed to the cost of the rehabilitation of the ship, with interest to the date of the tender back of the money.

On August 12, 1918, the United States government, being then at war with Germany, appropriated the steamer Gut Heil for war purposes. Subsequently a Naval Board of Appraisement allowed to John W. Thompson the sum of $700,000 as a fair value of the ship. Thompson collected this sum of money from the government, but he declared that was not just compensation. Therefore in January, 1919, Thompson sued the United States in the Court of Claims for a balance of the compensation which he asserted to be due him on on the vessel. In this action the Court of Claims after Thompson's death, awarded judgment for the additional sum of $400,000, together with interest in the sum of $180,733.34, making a total judgment against the government of $558,733.34. The briefs inform us that this sum was paid to respondents while this appeal has been pending.

Appellants by their amended demand made claim against the estate of Thompson for one-half of the total amount which he received from the government through the Naval Board and also for one-half of

the judgment, less certain credits which appellants conceded in their demand. The sum received for the Gut Heil, namely $700,000, paid after the seizure of the vessel by the Navy Department, and $580,-733.34 additional compensation adjudged by the Court of Claims make a total of $1,280,733.34. One-half of this amount as stated in the demand is $640,000.67. Appellants in their claim gave credit upon this gross sum for $130,000, being one-half of $260,000, the approximate sum alleged to have been expended in reconditioning the ship; $352,000 advanced by Thompson on behalf of Carden and Herd, as their pleadings allege, at the time that appellants purchased the one-half interest of Underwood and Associates (Atlantic Towing Company) in the Gut Heil. The two credits amounting to $482,000, being deducted from $640,366.67 the one-half gross amount received and adjudged for the ship, left a balance of $158,366.67 for which, with interest from August 1, 1918, appellants made claim upon the estate.

The basis of the claim was that on August 1, 1918, Thompson undertook to repudiate his agreement with the claimants, as they pleaded it, and wrongfully and unlawfully claimed sole ownership of the ship Gut Heil. It will be noted that the date of this alleged conversion of the interest of appellants was the date on which Thompson elected to terminate the agreement between him and appellants upon their failure to perform the agreement as he understood it. In other words the right of Thompson to terminate the contract is the main issue.

Appellants in support of their demand for damages for conversion, set up that on or about April 8, 1918, Thompson and the Atlantic Towing Company being then the owners in equal parts of the ship Gut Heil, Thompson acting as agent for appellants acquired on behalf of appellants from the Atlantic Towing Company its one-half interest in the ship and that at the time of the purchase Thompson made a memorandum in writing (Exhibit FF set out above) as to the interest that Underwood and Associates (The Atlantic Company) had in the ship and as to the interest which appellants would acquire upon purchasing such interest. Appellants in their claim further alleged that at the time of the purchase in their behalf of the one-half interest in the ship it was understood between them and Thompson that they were not to be called upon to pay the amount which Thompson advanced to purchase the outstanding one-half interest until the status of the ship had been fixed, that is until Thompson had accepted one of various offers to charter the ship upon its being transferred to a foreign register. Appellants also set up that in July and August, 1918, they obtained valid offers for the use or sale of the ship but that Thompson refused to consent to the acceptance of any offer.

Respondents' answer and counterclaim pleaded in the answering part first, a general denial and next specific defenses. The

principal defenses of the answer were pleas, in bar of appellants' claim, of the Statute of Frauds and of Limitations, and the rightful rescission of the contract by Thompson, in which rescission appellants acquiesced by their acceptance from Thompson at the time of the rescission of the amount with interest which appellants had contributed toward the repair of the vessel. The answer concluded with the allegation that, in the event of any conflict between the averment of the answers and the allegations of the counterclaim to follow, the averments of the answer should prevail. The trial of the cause began on June 20, and ended on June 24, 1927, and was taken as submitted. Respondents, after the trial and on July 2, 1927, by leave of court, struck out all the answer after the general denial and down to the counterclaims that is to say, the eight special defenses and the allegation that, in the event of conflict the allegations of the answer should prevail over those of the counterclaims. Appellants made no mention in their abstract of this action of respondents. In fact appellants in their reply brief state that respondents' supplemental abstract showing the ''asserted record entry'' after trial granting leave to strike out parts of the answer is a real addition to the record. As appellants, in the seventy-one grounds stated in their motion for a new trial below and in their twelve assignments of error here make no point of the order of the court granting leave to respondents to strike out, we do not feel that we should review the objections to the action of the court, raised for the first time by appellants in their reply brief. But we may see fit, in our examination of other aspects of the case to make further reference to this action of the trial court. Appellants filed a reply to the specific defenses of the answer and the trial court sustained respondents' motion to strike out this reply. In view of the fact that appellants did not properly save exceptions to the order of the court granting respondents leave to cut down their answer to a general denial, we regard as a moot question appellants' assignment of error predicated on the order striking out the reply. It was aimed at parts of the answer which the court permitted respondents to strike out.

The trial court, as we have said, found in favor of respondents in the sum of $341,663.55 upon their first counterclaim. As appellants base several assignments of error upon this counterclaim and the allowance of it, we will summarize its allegations. It recited the sinking of the vessel, its status as an abandoned wreck, its refloating by the joint efforts of Thompson and the Atlantic Towing Company, both of whom had a half interest in it, all of which we have recited in extracts from the trial court's statement of facts. The counterclaim alleged that about April 1, 1918, the Atlantic Towing Company proposed to sell its half interest in the vessel to Thompson for $428,-000 cash; that on February 22, 1918, appellant Herd offered to represent Thompson on a contingent basis to obtain from the United

States Shipping Board contracts for three round trip Atlantic voyages of the vessel; that relying upon the representations of Herd with respect to these voyages, Thompson, upon the receipt of the sale offer of the towing company, offered to appellants an opportunity to acquire a one-half interest in the ship; that as a result of this offer appellants and Thompson made an oral contract, the terms of which, Thompson being dead, respondents pleaded in the alternative, professing their belief in the first alternative. This first alternative statement was that Thompson agreed to sell to appellants, Carden and Herd, a half interest in the steamer, for a sum equal to one-half of the moneys expended by Thompson in the salvaging, repairing and acquisition of the ship, including court costs and attorneys' fees to April 25, 1918, payable $350,000 cash and the balance on presentation and settlement of accounts, and for the further consideration that all costs and expenses incurred subsequent to April 25, 1918, should be paid on demand, one-half by Thompson and one-half by Carden and Herd. If the court should find that the contract between Thompson and appellants was as thus stated, then, the counterclaim alleged, appellants, Carden and Herd, should be charged and credited with sundry sums, which it is not necessary to detail here as we intend to quote the financial set-up by which the trial court arrived at its judgment. Among the credit items is one for $350,000, one-half of the sum received by Thompson through the Naval Board after the date of the conversion. On the basis of the figures pleaded by respondents in their first alternative statement of the contract, the counterclaim charged that there was due to Thompson from appellants Carden and Herd, on December 20, 1917, $315,967.85, which with $158,133.56, interest to April 13, 1927, made $474,101.41 due from appellants to the Thompson estate, for which amount respondents prayed judgment, if the court should find the contract to have been as first alternatively pleaded.

For their second alternative statement of the contract made, respondents alleged in their counterclaim that Thompson agreed to buy for Carden and Herd the half interest of the Atlantic Towing Company in the vessel for $428,000, which amount they agreed to repay to Thompson, together with one-half of future costs of reconditioning the vessel. If the court should find that the contract was as so pleaded, the counterclaim alleged that there was due from appellants to the Thompson estate the sum of $273,020.58. The stated account producing this result included interest charges to April 13, 1927, against appellants in the sum of $110,986.93 and a credit of $350,000 one-half of the amount paid through the Naval Board of Appraisal. Judgment for this sum was prayed in case of a finding based upon the second alternative.

Concerning the oral contract between Thompson and appellants, the counterclaim alleged that the price of the sale of the half interest

of Atlantic Towing Company to Thompson was communicated by
Thompson to Carden and Herd before the purchase was consummated,
and thereupon, between April 6, and April 10, 1918, a set of letters
and telegrams was exchanged between Thompson and appellants.
The telegrams were set out at large in the counterclaim and were
undisputed evidence at the trial. In the first telegram Carden said:
"Buy interest for us at price named in agreement. Pay for same
if you can get no extension and we will pay same sum." In an-
swer dated April 8, Thompson informed appellants that he was
unable to get an extension beyond noon that day and that he had
paid $428,000. He' requested appellants to wire him upon what bank
he should draw. On April 9, appellants inquired of Thompson
whether it would be agreeable to settle the matter with him per-
sonally upon his return to Washington, "thus avoiding any publicity
or record through banks." Thompson replied on April 10, 1918, by
wire: "It will be agreeable to me to pay over money to me in Wash-
ington on my return which will be within a few days." The counter-
claim alleged these communications showed that the price of the
half interest from the Atlantic Towing Company was $428,000, no
part of which was ever paid by appellants to Thompson.

The second counterclaim asked for $175,000 damages claimed to
have been suffered by Thompson by reason of representations, al-
leged to have been false, made by appellants to the naval authorities
during the pendency of the appraisal proceedings to the effect that
appellants owned a half interest in the Gut Heil. The third counter-
claim asked for $200,000 damages alleged to have been suffered by
Thompson and by his estate by reason of the fact that appellants
withheld from the Naval Board of Appraisal and from the Court of
Claims certain information concerning the true value of the Gut
Heil. The fourth counterclaim restated the account stated by appel-
lants in their amended proof of claim. The account as thus restated
showed a balance of $225,166.66 due to the Thompson estate, for
which judgment was asked. As we have said, the court found against
respondents on the second, third and fourth counterclaims.

Appellants, in their answers to respondents' four counterclaims
made general denials, and, as to counterclaims one, two and three,
they also pleaded in bar the Statute of Limitations, alleging that the
counterclaims were for pretended losses of money, which accrued in
1918, and were not asserted or prosecuted in any manner until the
counterclaims were filed on April 13, 1927. By way of answer to the
fourth counterclaim in which respondents restated the account upon
the basis of appellants' pleaded figures, appellants made a further
restatement of the account, and asserted that a balance of $400,527.73
was due to appellants from the Thompson estate. The court took
under advisement, upon the submission of the cause, the motion of
respondents to strike out the answers, and it sustained the motion

upon the rendition of final judgment. This was in legal effect a ruling that the Statute of Limitations did not run against the counter-claims. In the view which we take of the proper disposition of the case we need not pass on appellants' assignment of error based on the action of the court in striking out their answers to the counter-claims.

I. The question, which is first in importance and in logical order, is whether the court erred in giving judgment in favor of respondents, the administratrices of Thompson, upon appellants' amended demand. We are of opinion that this conclusion of the court is supported by the law and the evidence. We have seen that the court found that the contract between appellants and Thompson was as stated in Spencer Exhibit No. 7 and not as stated in Exhibit FF. The substantial evidence supporting this finding was thus sum-marized in the court's finding of facts:

"That the agreement was as is set forth in Spencer Exhibit 7 is testified to by Mr. Spencer (Thompson's attorney at the time) in clear and positive terms. He says that the original agreement, as stated by Thompson, Carden and Herd in his presence during the interviews in Washington and New York (from July 10 to July 22) was that Carden and Herd were to pay Thompson a price equal to the moneys expended by Thompson in the salvaging, repairing and acquisition of the ship; that originally this was to be a cash trans-action; that later Carden and Herd offered to pay $350,000 in cash and the balance on presentation and settlement of accounts showing Thompson's expenditures; that Thompson, in his anxiety to collect this payment, employed Spencer to go from New Orleans to Washing-ton, and from there on to New York in an effort to make the col-lection. This testimony is not denied."

The trial court also found that, because appellants did not perform the contract, Thompson rescinded it. Upon this point the court found:

"Between April 15 and July 15, 1918, claimants advanced and paid various sums of money to Thompson in partial reimbursement of moneys expended by him for the joint account in the repair and outfitting of the steamer. These sums aggregated about $50,000. (Amount not definitely shown.) On August 1, 1918, Mr. Spencer, attorney for Mr. Thompson, returned the claimants all moneys so advanced by them with interest, amounting to $52,541.66, and at-tempted to rescind the contract. Claimants, however, refused to acquiesce in such rescission, and defendants themselves ultimately repudiated it and affirmed the contract by bringing suit on it by their first and fourth counterclaim in this case."

The evidence supporting the finding that Thompson rescinded the contract is found in the Spencer deposition and in the following

letter dated August 1, 1918, written by Mr. Spencer, Thompson's attorney to appellants:

"In pursuance of the notice given you by Mr. J. W. Thompson in his letter to you dated July 24th, 1918, we beg, in behalf of Mr. Thompson, to hand you herewith New York exchange to your order for the sum of $52,541.66. This sum is in repayment and return of all sums advanced by you on account of repairs to the steamship Gut Heil plus six per cent interest from date of each payment up to August 5th, 1918, as per attached statement.

"In view of your failure or refusal to duly perform your part of the agreement between you and Mr. Thompson with reference to said steamship, Mr. Thompson considers that the contract is void and not binding upon him and hereby abrogates the same."

Thompson not only "attempted to rescind the contract" as the court stated in its findings, but he and, after his death, appellants consummated the rescission. That Thompson, after August 1, 1918, acted consistently with his abrogation of the contract is proved by the testimony of both sides. It clearly appears from the court's statement of facts and is undisputed. He, acting as sole owner, prosecuted a claim for compensation for the seizure of the ship before the Naval Board of Appraisal. He received and retained $700,000 found by that board to be the reasonable value of the vessel. Again claiming to be sole owner, he prosecuted an action against the United States in the Court of Claims for additional compensation. This action was pending at his death on May 3, 1926, and his administratrices. respondents here, who assumed the prosecution, recovered judgment for $580,733.34 on July 1, 1926. This amount, the briefs state, respondents collected and retained from appellants, while this appeal has been pending. Our conclusion is there was abundant testimony that appellants owned a one-half interest in the ship subject to defeasance in the event they failed to pay to Thompson the purchase price of that interest and their share of the rehabilitation of the ship; that they defaulted in the payments; that thereupon Thompson exercised his right to abrogate the contract under which appellants acquired a half interest; that therefore Thompson did not unlawfully convert appellants' share in the ship, and appellants were not entitled to the allowance of their claim.

II. But could respondents, the administratrices of Thompson, having been sued in the probate court for the consequences of his abrogation, lawfully repudiate his rescission of the contract, reaffirm it and by their counterclaims sue upon it as reaffirmed? The court not only found that they did so, but it sustained them in so doing, by giving judgment in their favor in the sum of $341,663.55 upon their first counterclaim. The court arrived at this strange result, as appears from its conclusions of law, thus:

"The claimants are indebted to the defendants as follows:

"April 8, 1918. To purchase price advanced by
Thompson for claimants as found in Finding
No. 7 ........................................ $  537,097.53
"Dec. 27, 1927. Interest on above to date ......     313,272.91
"August 12, 1918. To one-half amount expended
by Thompson in repairing vessel, as found by
Finding No. 10 ...........................     126,089.78
"Dec. 27, 1927. Interest on above date .........:.      71,165.79

                                                     —————————
                                                    $1,047,626.01

## "XII

"Upon the indebtedness due from claimants to defendants, as aforesaid, claimants are entitled to the following credits:
"Dec. 20, 1918. To one-half of $700,000 received by
Thompson as per Finding No. 15 ............ $350,000.00
"Dec. 27, 1927. Interest on above to date ......    189,404.00
"Dec. 27, 1927. To one-half net value of Gut Heil
judgment as per Finding No. 9 ..............    166,558.46

                                                     —————————
"Dec. 27, 1927, Total credits ........ $705,962.46

## "XIII

"The claimants are obligated to pay the defendants half of the cost of collecting said $700,000 and of recovering said Gut Heil judgment."

Although Thompson, upon the abrogation of the contract on August 1, 1918, refunded to appellants a sum in excess of $50,000 which they had contributed toward the cost of repairing the vessel, the trial court found that, respondents having rescinded the rescission, appellants were indebted to respondents in the sum of $126,089.78, being one-half the cost of the repairs. Although, after Thompson had declared the contract with appellants void and not binding on him, he collected $700,000 and his administratrices collected $580,-733.34 additional, a total of $1,280,733.34 from the United States for the seizure of the ship, and although appellants received no part of these sums, yet the trial court, in arriving at the amount of its judgment against appellants, charged them with one-half of $257,-616.41, paid by Thompson and his administratrices (appellants) as attorneys' fees and for other expenses in recovering in the two proceedings $1,280,733.34. This charge for the collection costs is to be found in an analysis of the credit of $155,558.46 allowed by the court to appellants as one-half of the "net value" of the Gut Heil judgment for $580,733.34. The court in its findings determined the net value by deducting the expenses and attorneys' fees in the two proceedings from the face of the Gut Heil judgment. It is obvious therefore that a credit to appellants of one-half the net value of the

Gut Heil judgment was in fact and effect a charge against appellants of one-half the costs and expenses incurred by Thompson and his administratrices in collecting from the government over $1,280 000.

We might make other observations of incongruous allowances to respondents on their counterclaim by further analysis of the court's method of calculating the amount of the judgment. But the fundamental fact is that respondents were not entitled to repudiate Thompson's consummated rescission of the contract or to reaffirm the contract after they had been sued for its rescission, or to counterclaim upon the reaffirmed contract. This course of conduct is so contrary to reason and to justice that any statement of an account supporting a judgment founded on these proceedings merely reflects and demonstrates the error of a repudiation of the fully consummated rescission. Other facts showing the incongruity of a reaffirmance by respondents of the contract abrogated by Thompson are: (1) Both sides alleged that in September, 1920, appellants sued Thompson in the Supreme Court of the State of New York for $447,000 damages for the alleged unlawful appropriation of appellants' half interest in the ship; that due service was had upon Thompson, that he answered and also caused the action to be removed to the United States District Court; and that the cause was pending when Thompson died. The court found that the cause was still pending at the time of judgment. While the nature of Thompson's answer does not fully appear it is a fair inference that he sought to justify the abrogation of the contract. (2) Respondents in their answer pleaded as a special defense the lawful abrogation of the contract by Thompson. It is true that, six days after the conclusion of the trial, respondents by leave of court amended their answer by striking out the special defenses. It is obvious that respondents obtained this order for the purpose of removing from their answer and counterclaim the too patent inconsistencies. But the first counterclaim, upon which judgment was given, and which rests upon a reaffirmance of the contract, is permeated with the theory of a rightful appropriation by Thompson and his administratrices of the benefits of ownership of the whole vessel. The respondents by their second counterclaim which was for $17,500 actual damages and for the like amount in punitive damages emphasized the inconsistency mentioned by seeking recovery upon the ground that, on August 28, 1918 (after the abrogation of the contract by Thompson) appellants lodged with the Secretary of the Navy a letter claiming a half interest in the ship, and asserted the like claim by personal appearance before the Solicitor of the Navy. By these representations, respondents pleaded in their second counterclaim, appellants libeled and slandered Thompson's title to the ship and caused the United States to require Thompson to give a bond in the sum of $350,000 to hold the government harmless against the ownership claims of appellants and subjected Thompson to a delay of

four months in collecting the whole sum of $700,000. The second counterclaim was not stricken out. The issues raised by it were tried and were decided in favor of appellants.

■ Respondents cannot take inconsistent positions. They cannot reaffirm the contract in suit which Thompson under whom they claim had abrogated and persisted in his action to the day of his death. and the fruits of which abrogation they received and enjoyed. [McClanahan v. West, 100 Mo. 309, 1. c. 322, 13 S. W. 674; Stoutzenberger v. Lamb (Mo. App.), 190 S. W. 963.] As was said in the Stoutzenberger case, supra: "Defendant cannot be suffered to blow hot and cold; to rescind and to affirm the contract. He must take one position or the other and stand by it." It is a rule of universal application that where distinct and separate defenses are included in the same answer and counterclaim they must be consistent with each other. The test is whether the proof of one defense necessarily disproves the other. [Finley v. Williams, 325 Mo. 688. 29 S. W. (2d) 103, 1. c. 105, and authorities cited.] The inconsistencies in the defenses in the instant case fall under the ban of this rule. They cannot meet the test and a judgment resting on them should fall with them. For the reasons stated we are of opinion that the trial court erred in finding for respondents in the sum of $341,663.55 on the first counterclaim.

III. In view of our conclusion that respondents could not maintain their first counterclaim, we do not deem it necessary to examine appellants' other assignments of error. The second, third, and fourth counterclaims properly were decided against respondents. The cause was tried most thoroughly and with great pains. The record covers over 600 pages and includes scores of exhibits. The ends of justice would not be served by a second trial. The major error was the allowance of respondents' first counterclaim. It is accordingly ordered that the judgment of the court below be reversed and that the cause be remanded with directions to enter a new judgment disallowing the amended demand of appellants and also disallowing the four counterclaims of respondents. *Cooley* and *Westhues, CC.,* concur.

PER CURIAM:—The foregoing opinion by FITZSIMMONS, C., is adopted as the opinion of the court. All the judges concur.